IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

KELLY BLAND, individually and on behalf of all others similarly situated,

Plaintiff,

v.

QUINTESSA LLC, INFOWORX DIRECT LLC; IWDLLC, LLC, and RONALD PERLSTEIN,

Defendants.

Case No. 5:25-cv-01428-J

**DEFENDANTS INFOWORX DIRECT, LLC, IWDLLC, LLC, AND RONALD PERLSTEIN'S MOTION TO DISMISS**

Defendants InfoWorx Direct, LLC (InfoWorx), IWDLLC, LLC (IWDLLC), and Ronald Perlstein (Perlstein) (collectively InfoWorx Defendants) file their motion to dismiss the complaint filed by Plaintiff Kelly Bland, an individual and on behalf of all others similarly situated and in support thereof would respectfully show the Court the following:

## I. INTRODUCTION

Plaintiff Kelly Bland f/k/a Kelly Pinn (Bland) is a serial litigant. She has filed dozens of lawsuits alleging violations of the Telephone Consumer Protection Act of 1991 (TCPA)—and the state law equivalents—against various defendants across the nation. Exhibit 1. In this case, Bland alleges that InfoWorx, IDWLLC, and Perlstein violated the TCPA under 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)-(d), 15 Oklahoma Statute § 775C (OTSA), and Texas Government Code §82.0651—the Texas analog of the TCPA—

by making telephone calls to her phone number, which is registered on the National Do-Not-Call Registry (DNC).[1]

In her complaint, Bland attempts to convert a small number of telephone phone calls she allegedly received from offshore call centers to her residence in Texas—many of which she admits she intentionally prolonged and requested using false identities—into an Oklahoma class action suit seeking millions in statutory damages.

This Court, however, lacks personal jurisdiction over the InfoWorx Defendants. Venue in this District is also improper. Additionally, Bland lacks Article III standing, fails to plead essential statutory elements under the TCPA and OTSA, and impermissibly relies on conclusory group pleading and speculative agency theories and allegations, which fail to plausibly support her claims.

## II. FACTUAL BACKGROUND (AS ALLEGED BY PLAINTIFF)

On November 26, 2025, Bland filed her complaint against Quintessa, LLC and the InfoWorx Defendants. Doc. 1. According to the complaint, Quintessa hires telemarketers and brokers, including Info Worx and Perlstein (via Info Worx and/or IWDLLC), to (1) run aggressive outbound campaigns—from offshore call centers—to numbers on the DNC Registry, (2) qualify recipients, and then (3) transfer them to Quintessa's onshore intake employees. Doc. 1 at ⁋⁋ 20-22, 60-61.

---

[1] Inexplicably, Bland also alleges that Defendants "violate[d] Texas law prohibiting barratry and solicitation." Doc. 1 at ⁋ 3. But Bland does not allege that the InfoWorx Defendants are a law firm or attorneys, that a Texas attorney directed the InfoWorx Defendants to solicit Bland, or that she entered into any contracts with the InfoWorx Defendants. Tex. Gov't Code § 82.0651.

Bland alleges Defendants and their telemarketers use spoofed caller IDs and generic trade names (such as "Accident Helpline" and "Accidental Claim Helpline") to hinder the identification of the underlying entities. *Id.* at ⁋⁋ 75-77. Plaintiff further alleges InfoWorx Defendants are vicariously liable for third-party telemarketers and that those telemarketers acted as InfoWorx Defendants' agents and co-conspirators within the scope of a joint enterprise. *Id.* at ⁋⁋ 25-26.

In 2024, Bland alleges that she received a series of telemarketing calls to her DNC-listed number using the trade name "Accidental Claim Helpline." *Id.* at ⁋ 28. Bland alleges that she told the callers that she was not interested and to stop calling her. *Id.* On July 8, 2024, she received multiple calls from the same caller ID. *Id.* at ⁋ 29. Of these calls, the first two ended before she spoke to the caller. *Id.* During a 3:57 p.m. call she heard a pause and "bloop," which she alleges is consistent with a predictive or automated dialer. *Id.* at ⁋ 30. Bland alleges that on that call, the caller solicited legal representation but failed to identify themself. *Id.* at ⁋ 31. Nonetheless, Bland elected to continue and encourage the intake process by providing a fake name (Annalise Fowler) and false details to induce being considered a "qualified" lead and to be transferred to a "senior supervisor" named "Jonathan." *Id.* at ⁋ 32. Johnathan transferred Bland to an "associate" who attempted to connect her to Quintessa. *Id.* at ⁋ 36. Bland instructed the associate to call her back at another non-DNC phone number. *Id.* At 4:30 p.m., per Bland's request, the associate called Bland on her *non-DNC number*. *Id.* at ⁋ 37. The associate then transferred Bland to Quintessa intake representative, "Oshea." *Id.* at ⁋ 37. On the call, Oshea referenced "the Accident Helpline" and provided Quintessa's intake number. *Id.* at ⁋ 38.

On or about July 12, 2024, Bland emailed Quintessa revoking any purported consent, requesting Quintessa's Do Not Call policy, and asking to be placed on its internal DNC list. *Id.* at ⁋ 41. Between July 9 and July 22, 2024, Bland alleges Quintessa sent six text messages to her *non-DNC* phone number. *Id.* at ⁋ 42.

On July 30, 2024, Quintessa provided Bland with its written internal DNC policy. *Id.* at ⁋ 43. The policy provides that telephone numbers should be immediately placed on its DNC list, added to a text-messaging DNC list updated hourly, and forwarded to third-party telemarketers, which Bland alleges did not occur. *Id.*

Bland alleges that Defendants' telemarketers called her again in 2025, often with the same predictive-dialer "bloop." *Id.* at ⁋⁋ 44-45. Bland fails to identify which telephone number she allegedly received the calls or if that number was on the DNC list. *Id.* at ⁋⁋ 46-51. Specifically, Bland alleges she received (1) a call on January 29, 2025, from "Adam" at "Accident Management Services" who inquired about recent accidents; (2) calls on February 5 and 11, 2025, from "Sam" at "Accidental Claim Helpline" who solicited her for "compensation money," and (3) subsequent calls from "Austin Gilbert" who sought to qualify her as a Lead and connect to Quintessa. *Id.* ⁋⁋ 45-51. On her call with Sam, Bland again elected to participate in and encourage the intake process by saying her name was "Jasmine Sullivan" and that she had previously been in a car accident. *Id.* at ⁋ 49. Later that day, Bland specifically requested that the caller call her back so she could continue the intake process. *Id.* at ⁋ 51. During the call back, Bland spoke with "Tim," a Quintessa employee. *Id.* at 54. Tim provided Bland with a Quintessa telephone number, and "caused Quintessa" to send her a text message and email. *Id.* at ⁋ 54-56.

### III. Bland's Litigation Against InfoWorx Defendants in Texas.

On December 11, 2024, Bland (then "Kelly Pinn") filed a class action complaint in the Northern District of Texas against Quintessa, InfoWorx, and Perlstein. Exhibit 2. In her complaint, Bland alleges against Defendants violations of the TCPA and OTSA for violative calls she received in 2024. *Id.* On March 11, 2025, Bland amended her complaint but still alleged violations of the TCPA and OTSA by Quintessa, InfoWorx, and Perlstein. Exhibit 3. On May 16, 2025, InfoWorx and Perlstein filed a Rule 12(b)(6) motion to dismiss Bland's amended complaint because she sued the wrong entity (InfoWorx) and failed to allege that Perlstein was personally liable for violating the TCPA. Exhibit 4. On August 1, 2025, the court entered an order denying the motion in part (that Bland sued the wrong party) and granting it in part (that Bland failed to sufficiently alleged Perlstein was personally liable). Exhibit 5. On August 14, 2025, Bland filed a notice of dismissal without prejudice. Exhibit 6.

### IV. ARGUMENT & AUTHORITIES

#### A. This Court lacks personal jurisdiction over the InfoWorx Defendants under Rule 12(b)(2).

Rule 12(b)(2) of the Federal Rules of Civil Procedure allows dismissal of a case for "lack of personal jurisdiction." "[D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316

(internal quotation marks omitted). This constitutional test strives to ascertain whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 877 (2011).

Since the Supreme Court's "seminal decision in *International Shoe*, [the Supreme Court's] decisions have recognized two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked' jurisdiction."). *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 582 U.S. 255, 262 (2017).

When the act or transaction being sued upon is unrelated to the defendant's contacts with the forum state, a court must exercise general personal jurisdiction. Such "all-purpose" jurisdiction exists only when the defendant's "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 403 (2017). The "paradigm forums in which a corporate defendant is at home are the corporation's place of incorporation and its principal place of business [but] the exercise of general jurisdiction is not limited to these forums; in an exceptional case, a corporate defendant's operations in another forum may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* "In order for a state court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 582 U.S. at 262 (internal quotation marks, citations, and emphasis omitted).

In her complaint, Bland alleges that "[t]his Court has personal jurisdiction over the Defendants because Defendants regularly conduct business in the state of Oklahoma" and the InfoWorx "Defendants conspired and participated in a joint enterprise with Quintessa, which violated various law in this state." Doc. 1 at ⁋ 13. Bland further alleges that "Perlstein, InfoWorx, and IWDLLC are all residents of Florida." *Id.* at ⁋ 12.

Moreover, Bland alleges that she "is a resident of Texas[,]" her Texas "telephone number . . . has been registered with the National DNC Registry for over ten years[,]" and she "uses this telephone number for personal, family, and household purposes . . . [as] her [Texas] residential number." Doc. 1 at ⁋⁋ 5, 27. Bland alleges that she received numerous calls on her residential phone number *in Texas*. *Id.* ⁋⁋ 27-40, 45-55, 73-88. Bland does not allege any nonconclusory, defendant-specific jurisdictional facts about any of the InfoWorx Defendants. The only Oklahoma-specific factual allegation she makes is that Quintessa "is an Oklahoma limited liability company" headquartered in Oklahoma City. Doc. 1 at ⁋ 6.

InfoWorx was dissolved on April 25, 2023. Exhibit 7 at ⁋ 2. It was never incorporated in the State of Oklahoma. *Id.* Rather, it was incorporated in Florida under the laws of the State of Florida. *Id.* InfoWorx did not maintain its principal office in the State of Oklahoma. *Id.* Instead, its principal office was located in Boca Raton, Florida. *Id.* InfoWorx has no offices, employees, or property located in Oklahoma. *Id.* InfoWorx does not conduct business in Oklahoma. *Id.*

Likewise, IWDLLC is a Florida limited liability company with its principal office in Boca Raton, Florida. Exhibit 7 at ⁋ 3. It has no offices, no employees, and no property located in Oklahoma. *Id.* IWDLLC does not conduct business in Oklahoma. *Id.*

Similarly, Perlstein is also a resident of Florida. Exhibit 7 at ⁋ 1. Perlstein does not conduct business in Oklahoma. *Id.*

This Court cannot exercise general personal jurisdiction over the InfoWorx Defendants because they are not "at home" in Oklahoma. None of InfoWorx Defendants' alleged contacts with Oklahoma are so continuous or systematic that they are at home in Oklahoma. Nor has Bland alleged that this case presents an "exceptional case" to subject them to general jurisdiction in Oklahoma. Accordingly, the Court must determine whether it has specific personal jurisdiction over the InfoWorx Defendants through the "minimum contacts" test. *See Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013).

"Because a state's sovereignty is territorial in nature, a defendant's contacts with the forum state must be sufficient such that, notwithstanding its lack of physical presence in the state, the state's exercise of sovereignty over it can be described as fair and just." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc*., 514 F.3d 1063, 1070 (10th Cir.2008). To implement this principle, courts typically make three inquires: (1) whether the defendant purposefully directed its activities at residents of the forum state; (2) whether the plaintiff's injury arose from those purposefully directed activities; and (3) whether exercising jurisdiction would offend traditional notions of fair play and substantial justice. *ClearOne Commc'ns, Inc. v. Bowers,* 651 F.3d 1200, 1214 (10th Cir. 2011). "Purposeful direction" has three requirements: (1) intentional action, (2) express aiming at the forum state, and (3)

knowledge that the brunt of the injury would be felt in the forum state. *Dudnikov,* 514 F.3d at 1072.

Here, Bland does not allege that (1) InfoWorx Defendants purposefully directed or expressly aimed their activities at residents of Oklahoma,[2] (2) she is an Oklahoma resident, (3) she received any violative calls in Oklahoma, (4) InfoWorx Defendants made any calls to her residence in Texas from Oklahoma, (5) InfoWorx Defendants knew Bland was a resident of Oklahoma (which she is not) and intended to call Bland in Oklahoma, (6) any of her alleged injuries occurred in Oklahoma, or (7) InfoWorx Defendants knew the brunt of her alleged injuries would be felt in Oklahoma.

Thus, Bland fails to allege that any of the InfoWorx Defendants' conduct was directed toward Oklahoma as the "focal point of the tort" or that InfoWorx Defendants purposefully availed themselves to jurisdiction in Oklahoma.[3] *See Dudnikov*, 514 F.3d at 1074 ("The express aiming element requires Oklahoma to have been the 'focal point' of the tort"). Therefore, this Court likewise lacks personal jurisdiction and should dismiss Bland's claims against InfoWorx Defendants.

---

[2] Bland's conclusory "conspiracy" or "joint enterprise" allegations also fail to establish personal jurisdiction because she merely asserts an association with a forum resident but fails to allege specific underlying forum-directed acts by the InfoWorx Defendants.

Bland also does not allege that Perlstein, individually, purposefully directed his activities at Oklahoma by personally engaging in the alleged violative calls, orchestrating the calls, or exercising some level of control over the vendor that made the calls. *Braver v. Clear Sky Fin., LLC*, No. CIV-22-710-R, 2023 WL 5439224, at *2 (W.D. Okla. Aug. 23, 2023).

[3] Regarding the third inquiry whether "exercising jurisdiction would offend traditional notions of fair play and substantial justice," because Bland failed to satisfy the minimum contacts burden, InfoWorx Defendants will not address this inquiry this motion. *Dudnikov,* 514 F.3d at 1080 (when a plaintiff satisfies its minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless "offend traditional notions of fair play and substantial justice").

**B. Venue in this District is improper under 28 U.S.C. § 1391.**

Under Rule 12(b)(3), a case must be dismissed if filed in an improper venue. 28 U.S.C. § 1391 governs venue in federal civil actions. A plaintiff must establish that venue is proper in the chosen district under § 1391(b). Section 1391(b)(1) provides venue is proper where any defendant resides, if all defendants reside in the same state. Section 1391(b)(2) provides venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. In her complaint, Bland alleges that "[v]enue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District. Doc. 1 at ⁋ 14. Not true.

Among the four named defendants in Bland's complaint, three are Florida residents or entities. Doc. 1 at ⁋⁋ 7-10. Only Quintessa is alleged to be an Oklahoma entity. *Id.* at ⁋ 6. Because all Defendants do not reside in Oklahoma, this District is not a proper venue under § 1391(b)(1).

Venue is also improper in this District under § 1391(b)(2) because the events giving rise to Bland's claims occurred outside Oklahoma. Bland does not allege that *any* of the events occurred in Oklahoma.[4] Rather, Bland alleges that Quintessa's "telemarketing campaigns are made from offshore call centers to telephone numbers on the DNC Registry" and that she—a Texas resident—received the alleged violative calls on her residential

[4] Bland makes the conclusory allegation that "Defendants regularly conduct business in the state of Oklahoma" and that the InfoWorx Defendants "conspired and participated in a joint enterprise with Quintessa, which violated various laws in this state." Doc. 1 at ⁋ 13. But Bland fails to plead any facts to support her threadbare allegations. *See Iqbal,* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

telephone number in *Texas*. *Id.* at ⁋⁋ 5, 21-22, 27. Accordingly, venue is improper in this District, and the Court should grant InfoWorx Defendants' motion to dismiss under Rule 12(b)(3).

**C. Bland fails to state a claim against InfoWorx Defendants under Rule 12(b)(6).**

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal of a case if a plaintiff fails "to state a claim upon which relief can be granted." Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

A claim satisfies the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. [Twombly's] plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023).

**i. Bland fails to allege that InfoWorx Defendants are liable under the TCPA or OTSA.**

47 U.S.C. § 227(b) provides "[i]t shall be unlawful for any person within the United States . . . to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without prior express consent of the called party . . . ." 47 U.S.C. § 227(c) describes the liability for a party who "initiates" a violative call and the relief a party may seek for receiving a violative call. 47 C.F.R. § 64.1200 provides that "[n]o person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." The FCC has concluded "that a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C. Rcd. 6574, 6583 (F.C.C. 2013).

In her complaint, Bland repeatedly alleges that unidentified "offshore call centers" initiated the violative calls she received and that the calls were transferred to various Quintessa employees. Doc. 1 ⁋⁋ 22, 23, 26, 54, 77, 80, 81. She also alleges that she spoke to live individuals, which cuts against her argument that the calls were made using artificial

or a prerecorded voice recordings. *Id.* at ⁋⁋ 28, 30-40, 46-54. Bland also alleges that "Defendants" initiated telephone solicitations but fails to isolate or identify which Defendant made the calls[5] or allege that the alleged calls were made to DNC telephone numbers. *Id.* at ⁋ 104.

Nowhere in the complaint does Bland allege that any of the InfoWorx Defendants—or any of their employees or agents—physically placed the violative calls.[6] Nor does she allege that the InfoWorx Defendants owned the dialing platform, selected the phone numbers to call, purchased or programmed any equipment, employed the callers, or controlled the call timing.

Furthermore, Bland alleges that the only time she received calls from the offshore call centers—not Perlstein—to her DNC telephone number was on July 8, 2024. Doc.1 at ⁋⁋ 28-29. Bland fails to allege that any of the other calls she received in 2025 were made to her DNC telephone number or made by InfoWorx Defendants. *Id.* at ⁋⁋ 45-57. Thus, Bland has not alleged that the InfoWorx Defendants were anything more than third parties who had a minor role in the causal chain that resulted in the making of a telephone call. *In the Matter of the Joint Petition Filed by Dish Network, LLC, et. al.*, 28 F.C.C. Rcd. at 6583.

---

[5] Courts in the Tenth Circuit reject group pleadings. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (Plaintiff's "complaint fails to isolate the allegedly unconstitutional acts of each defendant, and thereby does not provide adequate notice as to the nature of the claims against each").

[6] The only allegation Bland makes that any specific InfoWorx Defendants initiated any calls to her is that "Quintessa's call records confirm that *InfoWorx* initiated [a 2024] call by dialing Bland's ***non-DNC*** telephone number, and that InfoWorx then transferred Bland to Quintessa." Doc. 1 at ⁋ 59 (internal quotations omitted, emphasis added). Since this alleged call was not initiated by InfoWorx to a DNC telephone number, it is not violative under the TCPA.

Next, Bland relies on "bloop" sounds and pauses to allege that InfoWorx Defendants used an "automatic telephone dialing system" (ATDS) to make calls in violation of the TCPA. Doc. 1 at ¶¶ 2, 30, 42, 45, 87, 113, 115. The TCPA proscribes abusive telemarketing practices by imposing restrictions on making calls with an ATDS. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 398–99 (2021). The TCPA defines an ATDS as a piece of equipment with the capacity both "to store or produce telephone numbers to be called, using a random or sequential number generator," and to dial those numbers. *Id.* But Bland fails to allege any facts identifying any equipment used by InfoWorx Defendants or that the purported equipment (1) has the capacity to store or produce telephone numbers or (2) used a random or sequential number generator. Instead, Bland alleges that she spoke to numerous people on live calls, which contradict her conclusory allegation that an ATDS was used.

Finally, Bland admits that the alleged violative calls were self-inflicted. Specifically, she admits that she (1) provided false names to the callers, (2) provided her contact information, (3) participated in and encouraged the qualification screening process, (4) provided false information to encourage the callers to continue the process, and (5) induced callbacks to her non-DNC telephone number. Doc. 1 at ¶¶ 30-40, 46-54. Thus, through her own actions, Bland voluntarily engaged with the callers and created a relationship with them, which defeats her premise that she received unsolicited calls to her DNC telephone number. Accordingly, the Court should dismiss Bland's claims against InfoWorx Defendants.

**ii. Bland fails to allege Ronald Perlstein is personally liable under the TCPA.**

"Individual officers of an entity violating the TCPA can be personally liable" where the individual "had direct, personal participation in or personally authorized the conduct found to have violated the statute." *Braver*, 2023 WL 5439224 at *2 (internal citation omitted).

In *Braver*, Braver sought to hold Mr. Fransico, the sole managing member of a Florida limited liability company—Clear Sky Financial, LLC (Clear Sky), responsible for Clear Sky's alleged TCPA misconduct. *Id.* at *2. Braver alleged that there was an agency relationship between Fransico and the vendor that made the offending calls. *Id.* This Court determined that although (1) Francisco was the sole managing member of Clear Sky, (2) he oversees Clear Sky's business, and (3) he personally made the decision for Clear Sky to hire a third-party vendor to provide TCPA compliant leads, the facts established that (a) Clear Sky did not initiate outbound telemarketing calls, (b) Francisco did not direct the vendor to make calls into Oklahoma, (c) Franciso was not aware they were doing so, and (d) Francisco did not make the decision to contact Plaintiff. *Id.*

Here, Bland alleges that the violative calls "are made from offshore call centers." Doc. 1 at ⁋ 22. Bland never alleges that she received any communications from Perlstein. Instead, she describes calls from Oshea, Sam, Austin, Jonathan, Danny, and Tim, and texts from numbers associated with Quintessa's intake process. Doc. 1 at ⁋⁋ 33-38, 47-54. In fact, Bland admits that Perlstein himself did not make any violative calls: "After *Perlstein's telemarketers* [not Perlstein himself] connected Leads with Quintessa, Quintessa then qualified the Leads and assigned them to particular Clients." *Id.* at ⁋ 61 (emphasis added).

Bland further alleges:

Perlstein was InfoWorx's registered agent and manager, and was appointed to wind up InfoWorx's affairs. On information and belief, Perlstein has been InfoWorx's and IWDLLC's only officer, member, manager, or employee since at least January 1, 2024. Doc. 1 at ⁋ 10.

Bland also makes the conclusory allegations that:

Telemarketers Perlstein procured for Quintessa [not Perlstein himself] . . . *participated* in a common scheme using a common script developed to help Quintessa qualify Leads for its Clients in the telemarketing campaigns alleged above. Doc. 1 at ⁋ 58.

On information and belief, since at least April 4, 2024, Quintessa used Perlstein (*via InfoWorx and/or IWDLLC*) *as its broker to procure and manage the telemarketers who made the calls* alleged above. On information and belief, Perlstein (via InfoWorx and/or IWDLLC) procured "Live Transfers" of Leads to Quintessa's (888) 501-1788 number, and Quintessa paid Perlstein (*via InfoWorx and/or IWDLLC*) on a per-"Qualified Call" basis. *Id.* at ⁋ 60 (emphasis added).

Perlstein personally *procured and managed the telemarketers* who called Bland, and trained them to access and use the websites and other systems that received, stored, and transmitted information about the Leads during Quintessa's intake process, and—ultimately—to connect Leads with Quintessa's intake line. *Id.* at ⁋ 61 (emphasis added).

Quintessa and Perlstein (via InfoWorx and/or IWDLLC) controlled the manner and means of the telemarketing campaigns through interim instructions. On information and belief, Quintessa and Perlstein: (1) gave frequent feedback to their telemarketers (including, ultimately, the commissions they paid); (2) had access to or controlled the telemarketers' call records; (3) retained the right and ability to collect audio recordings of the telemarketers' outgoing calls on demand, and routinely reviewed such recordings for quality control; (4) controlled telemarketers' login credentials for Quintessa's intake systems; (5) closely monitored how the telemarketers used Quintessa's intake systems, so they could (for instance) attribute calls to particular telemarketers; and (6) requested (and received) ostensible evidence that Leads had consented to receive these telemarketing calls. *Id.* at ⁋ 63.

All of InfoWorx's and/or IWDLLC's conduct alleged herein is controlled, carried out by, and/or attributable to Perlstein. Perlstein is the only officer, member, manager, or employee for both InfoWorx and IWDLLC, neither

> company can act except through Perlstein. For instance, Perlstein personally signed any written contracts InfoWorx and/or IWDLLC had with Quintessa and its telemarketers, personally developed the script or scheme used by Quintessa's telemarketers, personally *procured* Quintessa's telemarketers, and personally *monitored* Quintessa's telemarketing campaigns and telemarketers via, e.g., Quintessa's intake systems, especially the telemarketers' qualification of the Leads. *Id.* at ⁋ 66 (emphasis added).

> Perlstein had direct, personal participation in or personally authorized the TCPA violations alleged herein, and was the guiding spirit and central figure behind InfoWorx's and/or IWDLLC's telemarketing practices which violated the TCPA. On information and belief, Perlstein knew which telemarketers InfoWorx and/or IWDLLC used to provide Leads to Quintessa, and in fact personally selected and *managed* those telemarketers. Perlstein knew that these telemarketers were making telephone calls to secure more Leads for Quintessa and that those calls violated the TCPA. Nonetheless, Perlstein continued to hire and pay commissions to the telemarketers InfoWorx and/or IWDLLC used to provide Leads to Quintessa. *Id.* at ⁋ 72 (emphasis added).

But none of Bland's allegations regarding Perlstein are tethered to any specific calls *Perlstein* made to Bland (or anyone else) or to any call made by Perlstein to her DNC telephone number. Like *Braver*, although Bland alleges (1) Perlstein was the sole managing member of InfoWorx and IWDLLC, (2) he manages the business of InfoWorx and IWDLLC, and (3) he personally procured and monitored the telemarketers to provide TCPA leads, she does not allege that Perlstein (a) initiated any outbound telemarketing calls, (b) directed the telemarketers to make calls into Oklahoma, (c) was aware they were doing so, or (d) made the decision to contact Bland. Thus, all of Perlstein's alleged conduct relate to his tangential role in "procuring" and "managing" the telemarketers who made the calls and "monitoring" Quintessa's intake process. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, et. al.*, 28 F.C.C. Rcd. at 6583.

Additionally, none of the alleged conduct in Bland's complaint relates to Perlstein taking any steps necessary to physically place the calls *to her*, as required by the TCPA. She does not allege that Perlstein had direct, personal participation in or personally authorized the conduct found to have violated the statute. Nor does Bland allege any facts to support her conclusory and vague allegation that an agency relationship exists between Perlstein and Quintessa. Bland's allegations are not sufficient for the Court to reasonably infer Perlstein is personally liable for the alleged misconduct, nor are her allegations entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678. Thus, Bland's conclusory allegations, unsupported factual deductions and legal conclusions masquerading as facts cannot prevent dismissal. Accordingly, this Court should grant the InfoWorx Defendants' motion to dismiss.

**D. Bland lacks standing under Article III and her complaint must be dismissed under Rule 12(b)(1).**

To establish Article III standing, a plaintiff's complaint must allege facts showing that the plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In her complaint, Bland fails to allege any facts that would suggest the alleged violative calls are fairly traceable to the conduct of the InfoWorx Defendants. Bland fails to allege the specific conduct of any individual defendant. Rather, Bland alleges the calls to her were initiated by offshore call centers but fails to establish any link to the InfoWorx Defendants. Doc. 1 at ¶¶ 20-22, 60-61. Article III standing is not satisfied where the

conduct at issue results from "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 561 (quotation omitted). Thus, the violative calls made by offshore call centers not before the Court are not particularized or fairly traceable to the InfoWorx Defendants.

Even if Bland had sufficiently alleged Article III standing, as described above, her complaint does not state plausible claims for relief against the InfoWorx Defendants. To be liable under the TCPA, an individual must have initiated the offending communication, "meaning the person 'takes the steps necessary to physically place a telephone call'" or text message. *In re Dish Network, LLC*, 28 FCC Rcd. 6574, 6583 (2013). Individual officers of an entity violating the TCPA can be personally liable where the individual had direct, personal participation in or personally authorized the conduct found to have violated the statute. *Braver*, 2023 WL 5439224 at *2 (internal quotations omitted).

Here, Bland does not allege that the InfoWorx Defendants personally initiated or authorized the violative calls. Any such inference is implausible because Bland alleges the calls were initiated from offshore call centers. Doc. 1 at ⁋⁋ 20-22, 60-61. Because Bland has made no allegations suggesting that the InfoWorx Defendants could be personally liable to her under the TCPA, her claims must be dismissed under Rule 12(b)(1).

**CONCLUSION**

For the reasons stated above, Defendants InfoWorx Direct, LLC, IWDLLC, LLC, and Ronald Perlstein respectfully request that the Court grant their motion to dismiss, enter

an order dismissing the Plaintiff's complaint with prejudice, and enter such further relief to which they may be justly entitled.

Respectfully submitted,

/s/ *Peter L. Scimeca*
Peter L. Scimeca, OBA #21805
FELLERS, SNIDER, BLANKENSHIP,
BAILEY & TIPPENS, P.C.
100 N. Broadway, Suite 1700
Oklahoma City, OK 73102
Telephone: (405) 232-0621
Facsimile: (405) 232-9659
pscimeca@fellerssnider.com
ATTORNEYS FOR DEFENDANTS
INFOWORX DIRECT, LLC, IWDLLC,
LLC, AND RONALD PERLSTEIN

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been forwarded to counsel of record in this cause pursuant to and in accordance with the Federal Rules of Civil Procedure on March 3, 2026.

*s/ Peter L. Scimeca*
Peter L. Scimeca

#17427:957362